Lisa A. McClane
Nevada Bar No. 10139
Andrew D. Moore
Nevada Bar No. 9128
**JACKSON LEWIS P.C.**
3800 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 921-2460
Fax: (702) 921-2461
lisa.mcclane@jacksonlewis.com
andrew.moore@jacksonlewis.com

*Attorneys for Defendant*
*Apttus Corporation*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MARCO DE LA CUESTA, an individual, | Case No. |
| Plaintiff, | |
| v. | |
| APTTUS CORPORATION, a Delaware Corporation; DOES I-X, inclusive, | **NOTICE OF REMOVAL** |
| Defendant. | |

TO: THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

Defendant Apttus Corporation (the "Company") notices the removal of this action to the United States District Court for the District of Nevada and, in support thereof, states as follows:

1.     The Company is the defendant in the above-entitled action commenced in the Second Judicial District Court of the State of Nevada in and for Washoe County on July 27, 2017 (Case No. CV17-01433) that is now pending in that court. A copy of the Complaint is attached hereto as **Exhibit A**.

2.     Service of summons and complaint upon the Company was made by personal service on August 7, 2017. A copy of the Summons is attached hereto as **Exhibit B**.

3.     No further proceedings have been had in this matter in the Second Judicial District Court of the State of Nevada in and for Washoe County.

4.     The Company is and was at the time this action was commenced a corporation incorporated in the State of Delaware with its principal place of business in California. **Compl. ¶ 1; Exhibit C – Declaration of Margo Smith, ¶ 2.** Plaintiff is a resident and citizen of the State of Nevada. **Compl. ¶ 1.** There is now and there was at the time of the commencement of this action complete diversity between Plaintiff and the Company.

5.     The complaint alleges claims for fraud/misrepresentation, intentional interference with prospective economic advantage, wrongful termination, breach of contract, breach of the covenant of good faith and fair dealing, interference with contractual relations, and unjust enrichment. Plaintiff's complaint alleges that he has sustained damages "in excess of $15,000" for each of his seven claims. **Compl. ¶¶ 64, 73, 83, 104, 112.**

6.     Plaintiff also alleges a right to recover attorney's fees and costs as well as exemplary and punitive damages in excess of $15,000 each in regards to his fraud/misrepresentation, intentional interference with prospective economic advantage, wrongful termination, interference with contractual relations, and unjust enrichment claims. **Compl. ¶¶ 65, 66, 74, 75, 84, 85, 105, 106, 114, 115.**

7.     As such, the sum of the damages alleged by plaintiff exceeds $180,000.

8.     In addition, Plaintiff describes himself as a "senior level executive" and says that he was previously employed as "Regional Leader, Global Strategic Initiatives at SAP America. **Compl. ¶¶ 5, 10.** He claims Apttus interfered with his prospective economic advantage and contractual relations based on his former employment with SAP America and is also suing Apttus for alleged wrongful termination, breach of contract, and breach of the covenant of good faith and fair dealing which he asserts resulted in loss of income, stock options, and benefits.

Plaintiff's annual salary at Apttus was $200,000, which Plaintiff is less than his cash compensation at his former employer, SAP America.  **Compl. ¶ 12**.

9.      Plaintiff also contends Apttus was unjustly enriched by recruitment services he claims were unrelated to his employment contract.  **Compl. ¶ 109**.  Specifically, he claims that prior to his employment, Apttus paid in excess of $7 million dollars for recruitment.  **Compl. ¶ 108**.  Plaintiff states he recruited a minimum of five (5) sales professionals and estimates the value of his recruitment services to be in excess of $100,000 per recruited employee.  **Compl. ¶¶ 22, 210**.

10.      This Court has original jurisdiction over the subject matter of this action under the provisions of Section 1332 of Title 28 of the United States Code in that there is complete diversity between the parties and more than $75,000 in controversy exclusive of interest and costs.  Pursuant to Section 1441 of Title 28 of the United States Code, the Company is therefore entitled to remove this action to this Court.

11.      Thirty days have not elapsed since defendant was served with the summons and complaint in this action.  Copies of the summons and complaint are attached hereto as **Exhibits A and B**, constituting all of the papers and pleadings served on the Company.

12.      A true and correct copy of this Notice of Removal is being filed this date with the Clerk of the Second Judicial District Court of the State of Nevada in and for Washoe County.

/ / /

/ / /

/ / /

/ / /

/ / /

1   Based on the foregoing, the Company removes the above action now pending in the

2   Second Judicial District Court of the State of Nevada as Case No. CV17-01433 to this Court.

3   DATED:  August 28th, 2017.

4                                   **JACKSON LEWIS, P.C.**

5

6

7   /s/ Lisa A. McClane
    Lisa A. McClane, Nevada Bar 10139
    Andrew D. Moore, Nevada Bar 9128
8   3800 Howard Hughes Parkway, Suite 600
    Las Vegas, Nevada 89169

9
    *Attorneys for Defendant Apttus Corporation*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee with Jackson Lewis P.C. and that on this _28_ day of August, 2017, I caused to be sent via U.S. Mail, a true and correct copy of the above and foregoing **NOTICE OF REMOVAL** properly addressed to the following:

Michael J. Morrison
1495 Ridgeview Dr., Suite 220
Reno, NV 89519

*Attorney for Plaintiff*
*Marco De La Cuesta*

_____
Employee of Jackson Lewis P.C.

4836-7782-3308, v. 1

# EXHIBIT A

# EXHIBIT A

FILED
Electronically
CV17-01433
2017-07-27 03:15:20 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 6218593 : yviloria

$1425
Michael J. Morrison, Esq.
Nevada State Bar No. 1665
1495 Ridgeview Drive, Suite 220
Reno, NV 89519
Tel. 775-827-6300
venturelawusa@gmail.com

*Attorney for Plaintiff*
*Marco de la Cuesta*

# IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

## IN AND FOR THE COUNTY OF WASHOE

* * * * *

| | |
|---|---|
| MARCO DE LA CUESTA, an individual, | Case No. |
| Plaintiff, | Dept. No. |
| -vs- | |
| APTTUS, a Delaware Corporation; DOES I-X, inclusive, | **COMPLAINT** |
| Defendants. | **REQUEST EXEMPTION FROM ARBITRATION** (DAMAGES EXCEED $50,000) |

COMES NOW Plaintiff, Marco de la Cuesta, by and through his attorney, Michael J. Morrison, Esq., and complains against the Defendant, as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff MARCO DE LA CUESTA ("Marco") is, and at all relevant times was, a resident of Phoenix, Arizona.

2.      Defendant APTTUS ("Apttus") is, and at all relevant times was, a Delaware Corporation that does business in and had an office or offices in Washoe County, Nevada.

3.      Marco does not know the true names or capacities of the defendants sued as Does I-X, but is informed and believes, and therefore alleges, that each of the Doe defendants are legally responsible for the events and happenings alleged in this complaint and proximately caused damages to Marco, as alleged in this complaint.

1

1  Marco will seek to amend this complaint to insert the true names of those sued by

2  fictitious names, and with appropriate allegations, when the same becomes known.

3      4.      This case involves an employment relationship between Marco and

4  Apttus from November 2015 to June 2016 that gives rise to Marco's state law causes of

5  action against Apttus.  This Court has jurisdiction over this in this case based upon the

6  location at which Apttus maintained an office in Washoe County, Nevada, namely: 50

7  North Sierra Street, 1004, Reno, Nevada 89501; and that was the location at which

8  Marco was to perform some of his duties under his employment contract.

9  **BACKGROUND**

10  ***Apttus courted and hired Marco to manage its U.S. sales organization.***

11      5.      Marco is a senior level corporate executive with an extensive background

12  and experience in strategic development and sales in and with large and complex global

13  organizations.  Marco's strategic development and sales experience includes working

14  directly with the Regional Presidents and GM's.

15      6.      Apttus is a "Quote-to-Cash" (QTC) software provider, which generally

16  handles revenue operations between companies and their customers.

17      7.      In or about 2015, Apttus was seeking to develop more rigors around its

18  sales organization, specifically in reference to larger global accounts.

19      8.      In late 2015, Marco was introduced to Apttus as a candidate who could

20  help Apttus manage strategic, larger and more complex, and/or competitive accounts on

21  a global scale.

22      9.      At that time, Apttus's then-existing manager of the Global account team

23  and sales management lacked the skills and experience to drive strategic deals and

24  manage complex sales in larger global organizations.

25      10.    When Marco was introduced to Apttus, he was employed as a Regional

26  Leader, Global Strategic Initiatives at SAP America, where he had been for fifteen (15)

27  years, and had a secure position and highly-rewarding contract of employment.

28

11.     Based on Marco's background and experience, and to realize the U.S. and global sales goals that Apttus wanted to accomplish, and, with full knowledge of, but without regard to Marco's employment status and contract with SAP America, Apttus offered Marco a position managing its U.S. Global Account sales organization.

12.     To entice Marco to accept their offer and, very significantly, to leave his 15-year career at SAP and accept less cash compensation, Apttus offered Marco stock options and attractive commissions, all designed and intended to result in Marco receiving at least as much compensation as he was receiving at SAP America, which was specifically discussed and negotiated by Marco with Apttus.

13.     Recognizing how novice Apttus's sales management was, and given what Apttus wanted him to accomplish, Marco stated he would only accept the position if the Global Accounts Sales organization reported directly to Apttus's CEO, Kirk Krappe ("Krappe").

14.     The Board agreed to the direct reporting structure and agreed that Marco would manage the Apttus U.S. Global Account sales organization, which would be separate and distinct from the current sales organization, which was under the management of Kamal Ahluwalia ("Kamal").

15.     Anticipating that Apttus's current sales management would view the new global account sales team, and specifically Marco, as a threat, and prior to Marco accepting the position managing the U.S. account sales organization, Marco sought, and Krappe personally gave Marco unconditional assurances that Krappe would manage any negative and/or internal "political" issues that may arise because of Marco's new position and role in the company. Krappe specifically acknowledged and discussed with Marco the internal "political" issues, *to wit*: the fact that Marco's hiring may cause jealousy and insecurities within the Apttus upper management, since, unlike the rest of the upper management in Apttus, Marco had vast experience, proven successes and a stronger and justly-deserved reputation for performance in the industry and tech sector,

not only in Silicon Valley, but also throughout the U.S. and EMEA. Therefore, Krappe specifically acknowledged that Marco's reputation and successes could be intimidating and threatening to upper management and, thus, Krappe assured Marco that he would "manage" the matter, and insure that Marco would be able to do his job without "political" distractions, just as Krappe had promised and agreed.

16.    Prior to joining Apttus, senior Apttus management made specific and unconditional representations to Marco and others about Apttus's financial health, including information regarding:

    a.  the nature and extent of its client base;

    b.  its revenues and projected revenues, including its business pipeline of over $400 million;

    c.  the nature and extent of its products and product line; and

    d.  the nature and extent of employee opportunities and business development activities.

17.    Prior to joining Apttus (and throughout Marco's tenure there), senior Apttus management consistently represented that they had obtained the last round of venture capital funding needed to fuel growth to maximize Apttus's value, "either for and/or to be acquired," including the following statements:

    a.  by Krappe, that Saleforce.com had invested in the latest round of funding, as it had in a prior round of funding.

    b.  by Apttus Management, that they left the latest round open to give other potential investors an opportunity to invest, however, specifically represented that they had already received all the funds necessary to fuel growth of Apttus.

18.    Based on these express and unconditional representations and inducements by Apttus, Marco accepted the Apttus offer, as set forth by Krappe, and entered into a written employment agreement with Apttus on November 9, 2015.

19.    Pursuant to the Contract, Marco agreed to manage the Apttus U.S. Global Account sales organization, and in November 2015, joined Apttus as a full-time employee.

4

20.     In February 2016, at a Sales kickoff function, Apttus promoted Kamal from Chief Marketing Officer to Chief Revenue Officer.

21.     Kamal's promotion meant that all resources (sales enablement, operations, marketing and product marketing, industries and advance solutions/sales overlays) necessary for Marco to be successful were under Kamal's control.

***In his role as the manager of Apttus's U.S. account sales organization, Marco quickly built an experienced sales team.***

22.     After Marco joined Apttus, and following the directions of the Apttus Board of Directors ("Board"), and specifically those of Krappe, Marco was given the opportunity to hire and manage the U.S. Global Account Sales Team for Apttus.  He very quickly built an experienced and stalwart U.S. Sales Team, hiring 5 new and retaining 2 then-existing sales personnel in the United States.

23.     This Marco-led hiring and team-building was successfully performed by and through Marco and his long-strong-and-well-established personal network, and very significantly, without incurring the normal expensive recruiting fees Apttus had previously spent in 2015 and part of 2016 – a total of $7 Million – for headhunters to entice individuals to join Apttus.

24.     The GAM Program was called "Strategic Customer Engagements" ("SCE") and was under the direct supervision of the Office of the CEO, Krappe.

25.     Krappe arbitrarily assigned a GAM Program a sales quota of $50 Million Actual Cash Value.

26.     Krappe and Marco also specifically and unconditionally agreed that the selection of the Global Accounts would be as follows:

    a.     North America: SCE would select accounts for which SCE would be solely and exclusively responsible based on the individual GAM's relationships with accounts or prior knowledge of managing the account or strong industry relationships.  There were a handful of installed based Accounts that Apttus wanted SCE to manage due to customer complaints and lack of progress by poor performance by existing Apttus employees/managers.

5

b.  Additionally, both Krappe and Kamal specifically and unconditionally agreed that 10 Global Accounts would be assigned to each Global Account Manager.

27.  The individuals in Marco's US network advised Marco that, given Kamal's level of management experience and the problems employees had working with and under Kamal, they unequivocally refused to, and would not come on board with Apttus if they would be reporting to Kamal. Kamal and the Apttus management team had a well- and widely-known negative reputation in the tech industry – they were difficult to work with and disrespectful of employees.

### *Kamal and his management team purposely interfered with, obstructed and undermined Marco's efforts to develop Apttus's U.S. sales organization.*

28.  After Apttus hired Marco and his personally-recruited, highly-specialized, and widely-successful team of professionals, several members of Kamal's then-existing sales management team made comments that: (1) they, including Kamal, were not happy that Marco and his team of professionals were hired; (2) even though Kamal was consulted prior to Marco being hired, his management team was not happy that they were not consulted prior to Marco and his team being hired; (3) they were prohibited from working with SCE because SCE was not part of Kamal's organization (known throughout Apttus as the "Kingdom"); and (4) unless Marco and others in his team reported directly to Kamal, Kamal and his Kingdom members refused to, and absolutely would not work with Marco or his team.

29.  To complicate matters, management specifically instructed other Apttus employees, by e-mail, to refrain from providing support to Marco and his SCE Americas team - specifically noting Marco by name as a person Apttus employees should "not support" - even though such employees wanted very much to work with him and his organization, based on their reputation throughout the tech sector for success. Additionally, Apttus management specifically told Apttus employees that, if

Marco would work under and for Kamal, Apttus management would allow employees to work with and support Marco and his SCE.

30.     In their efforts to fast-track a stronger path to revenue for North America, Marco's team presented a list of Apttus's U.S. accounts that, based on their experience with the customer and contacts in the accounts community, they would be able to contact and quickly secure sales.

31.     During the account allocation of North America Accounts, Kamal and Jeff Santelices refused to turn over many of the accounts to Marco's team, specifically representing that such accounts were deals "close to closing", or that "they were in good hands and are non-negotiable," meaning that such accounts were not open for discussion, and more significantly, would definitely not be assigned to Marco's team, notwithstanding representations, assurances and inducements by Krappe to Marco to the contrary.

32.     Kamal's stated reasons for not turning over the accounts to Marco's team, as agreed to by Krappe, were illogical, unrelated to business plans and goals, and motivated by both bad faith and Kamal's hostility toward Marco, who was far more experienced and successful than both Kamal and Jeff in Sales Leadership.  For instance:

    a.  In one case, there was an account that did not even have a sales rep assigned to it, but Kamal would not let it be assigned to Marco's team.

    b.  In another case, the current sales rep was in process of being terminated, and there was nobody assigned to work the leads the departing employee was working on.

    c.  On one of the accounts, Jeff told Kirk that (1) there was "$300,000.00 in short-term revenue" available on an account, and (2) "Marco's organization was not focused on it."  Marco hosted a conference call with Kirk and Jeff (and Jeff's entire team), and positively reconfirmed that there was, in truth and fact, zero "short-term revenue" available on the subject account.

33.      While the discussions regarding account allocation senselessly and unnecessarily dragged on for several months, Kamal, who controlled all the resources, began a sinister and mean-spirited personal campaign to undermine Marco and his team, to interfere with their efforts to perform, and to make negative and derogatory comments about Marco and his team. For instance, in regard to the highly critical task of account transition, Kamal and/or his sales organization:

     a.   Failed and refused to provide account transition information;

     b.   Failed and refused to provide accurate transition information;

     c.   Failed and refused to transition all approved accounts;

     d.   Failed and refused to relinquish control of many accounts to be transitioned;

     e.   Intentionally and maliciously provided false and misleading information to Apttus's senior management, including statements that "Marco and his team were incompetent" and/or "making mistakes," and, specifically, falsely and maliciously stated:

         i.   "Additional revenue is on the table and Marco's organization is not focused on smaller deals."

         ii.   "Marco's SCE team does not input items in CRM."

         iii.   "Marco's SCE team does not have relationships in the accounts they selected."

34.      Kamal and/or his organization also deliberately and maliciously sought to undermine and cast a bad light on Marco and his team by:

     a.   Willfully holding back pertinent information from SCE Team members.

     b.   Refusing to respond to emails unless they copied Krappe.

     c.   Portraying to the entire Apttus organization that SCE is an organization under Kamal's sole and exclusive management;

     d.   Refusing to adhere to, follow and respect the clearly delineated and specifically structured SCE management chain and allocation/ownership of SCE accounts.

     e.   Continuing to pursue SCE accounts after unconditionally acknowledging that such accounts were to be transferred to and under the exclusive control and supervision of SCE.

f. Transferring unqualified business opportunities to SCE after the prescribed management holdout period so that SCE would have no choice but to close/abandon these so-called "opportunities" as "Closed Lost", thus reflecting in the Apttus business log that SCE had been "unsuccessful" in closing the deal, and instead, SCE had "lost" or "blown" the deal.

35.  The significant and ongoing sales operational challenges that Kamal and/or his organization (under his sole and exclusive direction and control) intentionally and maliciously created included:

a. Not executing on account assignment, including affiliates and subs, after repeated emails and conference calls wherein he was directed to/agreed to assign them.

b. Not routing leads for SCE accounts to SCE even after the account had been specifically identified as an SCE account.

c. Continuously reassigning SCE accounts to non-SCE account owners without SCE awareness or agreement.

d. Continuing to change Logons from original agreed parameters.

e. Delaying assignment of accounts in CRM to operations after such accounts had been specifically identified as to owner/person responsible for working the account.

36.  Kamal and/or his organization (under his direction and control) intentionally and maliciously interfered with sales efforts by Marco and SCE by:

a. Continually and falsely portraying, both internally and externally, SCE as part of Kamal's organization, misleading and causing confusion, both internally and with partners, and interfering with the execution of customer strategy.

b. Falsely showing Marco on the organizational chart at a level lower than Kamal, and showing Kamal at the same level as Krappe, thereby causing confusion for, and misleading, both Apttus employees and Apttus customers.

c. Continually and falsely placing incorrect position titles on the organizational chart, some of which were inflated, while demoting the title of Marco's management team, even after several discussions, demands and emails seeking to correct those position titles internally.

d. By-passing Marco and reaching out to Marco's direct reports to plan sales strategy and change direction on accounts.

e. Targeting individuals on Marco's team regarding training participation.

9

f. Failing and refusing to provide marketing support to Marco and his team, while providing such support to other territories.

37.   During the first business quarter (Q1) of 2016 (February through April), sales under Kamal were disastrous.  And it became absolutely clear that Apttus desperately needed Marco's sales experience to promote sales and give: (a) much needed credibility to Apttus; and (b) comfort to Apttus' larger customers, because:

a. the Board members admitted and knew very well that, since Kamal was running sales and Kamal had "never sold anything," Apttus's efforts to raise capital would not have been well received by the investment community. (Note: This statement was made publicly by Krappe to a large number of Apttus employees at the highly-hyped and heavily promoted "Sales Kickoff Meeting", and this statement, together with the rest of the statements made at the Sales Kickoff Meeting, was recorded by Apttus and available for "live stream".); and

b. Apttus could (and did) draw upon Marco's knowledge to improve the Apttus sales processes.

38.   During the time that Marco was diligently working to develop Apttus's U.S. sales organization, Kamal and his organization sought to purposely and maliciously interfere with, undermine, and sabotage Marco's efforts.

***Apttus terminated Marco***

39.   By April 2016 (the end of the first quarter), Kamal's sales results were significantly below expectations.  At that same time, Marco's team finally received the long-promised accounts, and SCE began its ramp-up.  In the technology industry, a ramp-up is expected/acknowledged industry-wide to take six (6) months to show results, a time frame also specifically acknowledged by Krappe.

40.   Kamal's group continued to maliciously undermine and disparage Marco and SCE, and Krappe failed to keep his promise to "manage" such "behavior/politics" by Kamal and his organization, instead leaving Marco's organization to struggle to try to do their jobs under the hostile and untenable working conditions maliciously created and consistently and repeatedly imposed on Marco and his organization by Kamal's group.

41.     As Marco and his team continued their efforts to develop relationships with, and sales to, U.S. organizations, they discovered that: (a) Apttus did not have a "$400 Million pipeline", a material misrepresentation that was specifically, continuously and unconditionally  represented to Marco and others by Krappe, Kamal and other Apttus management personnel; and (b) some of the Apttus products that Apttus management and personnel were heavily and vigorously "advertising/pumping", *and actually selling to Apttus clients,* did not exist and/or had not even been developed.  Krappe and Kamal had created and were running their operations in a culture and environment of deception and untruths.

42.     Additionally, Marco and his team also discovered that Apttus management, including very specifically Krappe and Kamal, was making numerous other highly material misrepresentations to its customers, other businesses, and the financial marketplace regarding, among other things, Apttus's products, the status of such products, and the identity of some of Apttus's clients.  All of these misrepresentations, which were made both directly/affirmatively and by omission, were made for the purpose making Apttus and its products "look better" and be better received by its potential clients, clients, and the marketplace.

43.     Marco and his team repeatedly informed Apttus senior management that: (a) Apttus did not have a "healthy pipeline" and that its actual pipeline was not the "$400 Million" that Apttus, and very specifically Krappe and Kamal, had represented, and was continuing to represent it to be; and (b) there was no financial information or documents of whatsoever nature to support the materially false and misleading assertion by Apttus, and very specifically Krappe and Kamal, that it had a "healthy pipeline".

44.     In fact, Marco was the first person to discover that the representations by Apttus, and very specifically Krappe and Kamal, regarding its pipeline were substantially and materially false and misleading, and furthermore, constituted

1  outrageous and egregious misrepresentations/omissions of material facts, which Apttus

2  management, and very specifically Krappe and Kamal, knew were false and

3  misleading, as and when made.

4      45.    Marco confronted and specifically advised Apttus management regarding

5  these false and misleading representations relating to the "health" of the Apttus

6  pipeline, and demanded that (1) Apttus cease-and-desist from making such false and

7  misleading representations/omissions, and (2) tell the truth regarding the disastrously

8  poor condition of the pipeline.  Apttus management, and very specifically Krappe and

9  Kamal, however, nevertheless continued to represent (actually, misrepresent) to

10  businesses and the financial marketplaces that its "pipeline was healthy."

11      46.    Apttus management, and very specifically Krappe and Kamal, was very

12  upset with and angry at Marco for confronting management with the true facts he had

13  discovered and reported to Apttus management relating to its false and misleading

14  statements/omissions regarding the "health" of its pipeline, and Apttus management,

15  and very specifically Krappe and Kamal, treated Marco in a hostile manner from that

16  point on, through and including his termination.

17      47.    Marco also repeatedly informed Apttus senior management, including,

18  specifically Krappe and Kamal, that Apttus and its management, including, specifically

19  Krappe and Kamal, were significantly and materially misrepresenting Apttus products

20  to customers, and otherwise.  Apttus management, including specifically Krappe and

21  Kamal, however, specifically and knowingly encouraged and facilitated the sales of the

22  products through misrepresentations that Marco had specifically informed management

23  about, and which Apttus management, including specifically Krappe and Kamal,

24  actually, undeniably and specifically knew were patently false and misleading,

25  including, patently false and misleading advertisements and statements to clients in the

26  marketplace.

27

28

48.     Moreover, Apttus management, and specifically Krappe and Kamal, similarly continued to falsely represent and identify as "its customers" well-known and substantial companies and businesses that were not, in truth and fact, "its customers", and Apttus management, and specifically Krappe and Kamal, knew were not "its customers".

49.     After Marco and his team specifically advised Apttus and its management including, specifically Krappe and Kamal, of the misstatements, misrepresentations, omissions and unethical business dealings, as described above, and after Marco and his team clearly, unconditionally and specifically advised management, including, specifically, Krappe and Kamal, to take steps to correct and accurately state the truth regarding those issues, Apttus, including, specifically, Krappe and Kamal, expressly and unconditionally directed Marco and his team to "lie to", and "hide that information" from its clients, potential clients, and the financial and business communities.

50.     Apttus, including, specifically, Krappe and Kamal, further specifically directed Marco and his team to perpetuate the above-referenced misrepresentations, false statements outright lies to Apttus's clients in order to protect Apttus, its management, and specifically Krappe and Kamal, and the Apttus products.

51.     When Marco and his team staunchly refused to "lie" or "hide information", the working relationships between Marco and his team and the management of Apttus, and specifically including Krappe and Kamal, deteriorated even more, and became a hostile working environment and relationship very rapidly thereafter.  Apttus management, and specifically including Krappe and Kamal, became upset and hostile toward Marco and his team, and in June 2016, the Board terminated Marco.

52.     Marco and his team had not been hired by Apttus with the *bona fide* good faith intent or purpose of allowing Marco and his team to use their demonstrated

1   substantial and well-proven skills and talents in the tech industry to further the actual,

2   true and existing business operations of Apttus, but rather, were hired and used solely

3   as "show horses" and "window dressing" to make Apttus appear more attractive,

4   successful and palatable to the tech and financial marketplaces; to enable Apttus to hire

5   staff that otherwise would not have accepted employment with Apttus; and to hide or

6   obfuscate Apttus's misrepresentations and fraud related to the true and accurate

7   financial health, business success and actual demonstrable products of Apttus, while

8   also lending credibility to future prospects for Apttus and its business and products.

9       53.    Marco and his team were terminated from their employment solely

10  because they refused to compromise their ethics and integrity and join in to the

11  deceptive, misleading, fraudulent and unfair business practices demanded from them

12  by, and practiced by, Apttus, specifically including Krappe and Kamal.

13

14  ### FIRST CLAIM FOR RELIEF
    #### Fraud/Misrepresentation

15      54.    Marco realleges the allegations in paragraphs 1-53 as though fully set

16  forth here.

17      55.    In late 2015, Marco was employed in a very long-term, safe, lucrative and

18  otherwise secure position with SAP, and had been for fifteen years.

19      56.    Apttus was undeniably and unequivocally fully aware of Marco's

20  employment status at SAP when Apttus approached Marcos seeking to have him quit

21  his position at SAP and come to work for Apttus, as Marco clearly and specifically told

22  Apttus the same.  At that time, Apttus offered to Marco, and enticed and induced Marco

23  to accept, a position with Apttus to manage a U.S. sales organization.

24      57.    Apttus enticed and induced to Marco to accept the position it

25  offered to him by representing:

26      a.  the nature and extent of its client base;

27      b.  its revenues and projected revenues, including its business pipeline of
        over $400 million;

28

    c.  the nature and extent of its products and product line;

    d.  that it had obtained venture capital funding needed to fuel growth and maximize Apttus's value; and

    e.  the nature and extent of employee opportunities and business development activities.

Very significantly, these exact representations relating to the business of Apttus were made specifically and unconditionally to Marco in person, face-to-face, by Krappe. The substance of these representations were also made specifically and unconditionally again by Krappe, in person, to Marco and others at a new-hire orientation presentation at a conference room located within the Apttus facility.

      58.    Apttus further enticed and induced Marco to accept the position it offered to him by:

    a.  offering Marco stock options in Apttus (in order for Marco to accept less cash compensation);

    b.  representing to Marco that he would report directly to Krappe, Apttus's CEO;

    c.  representing that his U.S. sales organization would be separate and distinct from the sales organization managed by Kamal; and

    d.  unconditionally assuring Marco that Krappe would manage any negative and/or internal "political" issues that may arise because of his position and role in the company.

Very significantly, while these 4 factors were important to Marco in making his decision, the five (5) delineated representations made in paragraph 57 (a through e, inclusive), above, relating to the business of Apttus, were the fundamental reason why Marco was induced, and upon which he specifically and justifiably relied in good faith in making his decision to leave SAP to accept employment with Apttus.

      59.    Apttus's representations to Marco were false and misleading, as and when they were made to Marco, and Apttus knew they were false or it made those representations recklessly without regard to their truth.  This conduct also constituted a "wrongful hiring" of Marco, as Apttus fraudulently induced Marco to accept

1 employment under false and misleading bases.

2      60.   Marco justifiably relied in good faith on those representations alleged

3 above relating to Apttus and its business and operations in accepting Apttus's offer of

4 employment.

5      61.   After accepting Apttus's offer of employment, Apttus, and specifically

6 including Krappe and Kamal, never gave Marco (or his team) the support,

7 opportunities, or time to realize any benefits from their respective employment

8 agreements with Apttus.  Instead, Apttus, and specifically including Krappe, allowed

9 Kamal to engage in a well-conceived, meticulously planned and maliciously executed

10 bad faith strategy to ensure that neither Marco, nor his team members, had any

11 opportunity to use their manifest experience, skills and talents to pursue or realize any

12 opportunities for success, either professionally or financially, or obtain the benefits of

13 their respective bargains and consideration they were promised when they agreed to

14 employment by Apttus.

15      62.   Apttus, and specifically including Krappe and Kamal, further engaged in

16 a scheme to, among other things:

17      a.  make promises and enter into contracts for promised and agreed-upon
18          lucrative compensation packages with Marco, and his team, which
            Apttus never intended to honor or pay; then,

19      b.  "milk" as much information and contacts from Marco, and his team of
20          industry experts, regarding the technology community;

21      c.  use Marco, and his team, to "pump-up"/promote Apttus and, thereby,
            enable it to obtain desperately needed financing; then

22      d.  fire Marco, and his team, before they had an opportunity to realize the
23          financial benefits offered and agreed to by Apttus; and finally,

24      e.  deprive Marco, and his team of the
25          compensation/shareholdings/equity interests/benefits in and from
            Apttus, all as promised and agreed upon by Apttus.

26      63.   Had Marco known Apttus's true motive and intent for hiring him, he

27 would not have accepted Apttus's offer of employment, used his substantial and

28 stalwart reputation to hire individuals for Apttus, and worked so diligently, with his

team, and tried so sincerely, to further the business and operations of Apttus in the course of his employment.

64.    As a direct and proximate result of Apttus's fraud and misrepresentations to him, Marco has been damaged in a sum in excess of $15,000.00.

65.    As a further direct and proximate result of Apttus's fraud and misrepresentations to him, Marco has been required to retain the services of an attorney to pursue his legal remedies in this action and, therefore, is entitled to an award of his reasonable attorney's fees and costs.

66.    Apttus's fraud and misrepresentations to Marco was reckless, wanton and malicious, entitling Marco to an award of exemplary and punitive damages in a sum in excess of $15,000.00.

## SECOND CLAIM FOR RELIEF
### Interference with prospective economic advantage

67.    Marco realleges the allegations in paragraphs 1-66 as though fully set forth here.

68.    Apttus knew that Marco was a highly-skilled and sought-after corporate sales leader with 15 years of exemplary industry experience, a stalwart reputation and proven results in the industry.

69.    Apttus was undeniably and unequivocally fully aware that Marco was a fifteen-year employee at SAP when Apttus approached Marcos seeking to have him quit his position at SAP and come to work for Apttus, as Marco clearly and specifically told Apttus the same.

70.    Based upon the representations by Apttus regarding the status and posture of its business, including, but not limited to the financial aspects and health thereof, as alleged above, Marco left a very long-term, safe, lucrative and otherwise secure position with SAP, where he had been for fifteen years.

71.    After hiring Marco, Apttus intentionally and maliciously engaged in a

course of conduct that put Marco in an untenable situation and intentionally frustrated and interfered with his efforts to perform his job and duties in the manner to which he had been accustomed and upon which his stellar reputation had been earned and deserved.

72.     Had Marco known Apttus's true motives and intents for hiring him, he would not have accepted Apttus's offer of employment or used his substantial and stalwart reputation and industry contacts for Apttus's benefit, but would have focused on and remained at his current company where he was considered a top talent with 15-plus years of experience and was in a leadership position.

73.     As a direct and proximate result of Apttus's intentional and/or negligent interference with his prospective economic advantages, Marco been damaged in a sum in excess of $15,000.00.

74.     As a further direct and proximate result of Apttus's interference with his prospective economic advantages, Marco has been required to retain the services of an attorney to pursue his legal remedies in this action and, therefore, is entitled to an award of his reasonable attorney's fees and costs.

75.     Apttus's interference with Marco's prospective economic advantages was reckless, wanton and malicious, entitling Marco to an award of exemplary and punitive damages in a sum in excess of $15,000.00.

## THIRD CLAIM FOR RELIEF
### Wrongful Termination

76.     Marco realleges the allegations in paragraphs 1-75 as though fully set forth here.

77.     After Marco began his employment with Apttus, and as he undertook his role managing its US global account sales organization, he realized and learned that Apttus had misrepresented its financial health and its products, not only to him, but

1  very significantly to its customers, employees, other businesses, and the financial
2  marketplace.

3      78.     Not only was Apttus's pipeline not healthy, but it was also promoting and
4  selling products, as fully-developed and tangible, operating products, when, in truth and
5  fact, such products had not even been developed. In fact, it was Marco who actually
6  discovered the atrocious and egregious misrepresentations regarding Apttus's pipeline.
7  Furthermore, Apttus's internal sales organization was engaging in false statements and
8  deception in the advertising, marketing and sale of Apttus's non-existent products.

9      79.     Based on his extensive experience and understanding of tech companies
10  and the marketplace, Marco soon learned and understood that Apttus management was
11  egregiously misrepresenting and falsely portraying Apttus's business, business health,
12  financial condition and products, and immediately reported the same to Apttus senior
13  management, including Krappe.  Marco very pointedly and specifically told the senior
14  management that their conduct was misleading, false and fraudulent, and further, that
15  they should immediately provide true and correct information truth regarding the state
16  of Apttus's business, business health, financial condition and products, and more
17  significantly, they should immediately cease and desist making misrepresentations and
18  misleading statements to customers, the financial community, its employees and the
19  business community.  Marco also advised management, including Krappe, to take steps
20  to correct and accurately state the truth regarding these issues.

21      80.     Apttus expressly and unconditionally directed Marco and his team to hide
22  the information Marco reported to its senior management, and to perpetuate the lies and
23  deception to Apttus's clients, customers, and the financial and business communities in
24  order to protect Apttus, its management, its financial status, its business and its
25  products.

26
27
28

19

81.    When Marco refused to perpetuate Apttus's lies or hide the truth about Apttus's business operations, financial health and its products, Marco's working relationship with Apttus, and especially Krappe, rapidly deteriorated.

82.    In retaliation for Marco's refusal to engage in the requested illegal and unethical conduct, and otherwise engage in a culture of dishonesty and corruption, and because he vocally voiced his opposition and refusal to Apttus management, Apttus management maliciously became angry, disrespectful, upset and hostile toward Marco and his team, and shortly thereafter, Apttus maliciously and in bad faith terminated Marco's employment. This was wrongful and, *inter alia*, violated public policies, and the duty of good faith and fair dealing.

83.    As a direct and proximate result of Apttus's wrongful termination of him, Marco has been damaged in a sum in excess of $15,000.00.

84.    As a further direct and proximate result of Apttus's wrongful termination of him, Marco has been required to retain the services of an attorney to pursue his legal remedies in this action and, therefore, is entitled to an award of his reasonable attorney's fees and costs.

85.    Apttus's wrongful termination of Marco was reckless, wanton and malicious, and violated public policies, each and all of which conduct entitles Marco to an award of exemplary and punitive damages in a sum in excess of $15,000.00.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract

86.    Marco realleges the allegations in paragraphs 1-85 as though fully set forth here.

87.    On November 9, 2015, Marco entered into a written employment contract with Apttus ("Contract").

88.    The Contract included compensation consisting of a salary; variable compensation in the form of commissions, with a target of $200,000 per year; stock

1    option plan with an option to purchase 20,000 shares of Apttus stock; holidays and

2    paid time off; and medical, dental, vision and 401 benefits.

3          89.     Marco fully performed his duties and obligations pursuant to the terms of

4    the Contract.

5          90.     Notwithstanding the clear and unequivocal terms of the Contract, which

6    terms Marco was fully performing, Apttus breached the Contract by terminating him as

7    a retaliation for his refusal to engage in and perpetuate fraudulent and unlawful conduct

8    by Apttus and its management, specifically including, but not limited to, Krappe and

9    Kamal. Although the Contract was an "at-will" employment contract, Apttus

10    terminated it in bad faith and for reasons violating public policies, making the

11    termination unlawful.

12          91.     As a direct and proximate result of Apttus's breach of its Contract with

13    him, Marco been damaged in a sum in excess of $15,000.00.

14          92.     As a further direct and proximate result of Apttus's breach of its Contract

15    with him, Marco has been required to retain the services of an attorney to pursue his

16    legal remedies in this action and, therefore, is entitled to an award of his reasonable

17    attorney's fees, expenses and costs.

18

19                     **FIFTH CLAIM FOR RELIEF**
               **Breach of covenant of good faith and fair dealing**

20          93.     Marco realleges the allegations in paragraphs 1-92 as though fully set

21    forth here.

22          94.     The implied covenant of good faith and fair dealing implied into the

23    parties' employment contract, by applicable Nevada law, prohibited arbitrary, bad faith

24    and unfair acts by Apttus that worked to the disadvantage of and were damaging to

25    Marco.

26          95.     Apttus breached the implied covenant of good faith and fair dealing

27    implied in its employment contract with Marco by acting in a manner that was

28

1   unfaithful to the purpose of the contract, acting in bad faith and dealing unfairly in its

2   employment relationship with Marco.

3       96.   Apttus's conduct in violation of the implied covenant of good faith and

4   fair dealing was arbitrary, malicious, retaliatory and unfair, and worked to the

5   disadvantage of, and was damaging to Marco.

6       97.   As a direct and proximate result of Apttus's breach of the covenant of

7   good faith and fair dealing implied in its employment contract, Marco been damaged in

8   a sum in excess of $15,000.00.

9       98.   As a further direct and proximate result of Apttus's breach of the

10  covenant of good faith and fair dealing implied in its employment contract with him,

11  Marco has been required to retain the services of an attorney to pursue his legal

12  remedies in this action and, therefore, is entitled to an award of his reasonable

13  attorney's fees and costs.

14

15
### SIXTH CLAIM FOR RELIEF
#### Interference with Contractual Relations

16      99.   Marco realleges the allegations in paragraphs 1-98 as though fully set

17  forth here.

18      100.   Apttus knew that Marco was, at the time Apttus first had contact with

19  him, employed as a Regional Leader, Global Strategic Initiatives at SAP America,

20  where he had been for fifteen (15) years, and had a secure position and highly-

21  rewarding contract of employment.

22      101.   Based upon the representations by Apttus of its business regarding the

23  status and posture of its business, including, but not limited to the financial aspects and

24  health thereof, as alleged above, Marco left his very long-term, safe, lucrative and

25  otherwise secure position with SAP to join Apttus.

26      102.   Had Marco known that the representations, as alleged above, Apttus

27  made to him to induce him to leave his secure employment with SAP America were

28

1 false and misleading, he would not have accepted Apttus's offer of employment or used

2 his substantial and stalwart reputation and industry contacts for Apttus's benefit, but,

3 rather, would have focused on and remained at SAP America, under a secure and

4 rewarding contract, where he was considered a top talent with 15-plus years of

5 experience and was in a leadership position.

6      103.   The conduct of Apttus constitutes an intentional and/or negligent

7 interference with Marco's contractual rights and relationships with SAP America.

8      104.   As a direct and proximate result of Apttus's interference with his

9 contractual relationship with SAP America, Marco been damaged in a sum in excess of

10 $15,000.00.

11      105.   As a further direct and proximate result of Apttus's interference with his

12 contractual relationship with SAP America, Marco has been required to retain the

13 services of an attorney to pursue his legal remedies in this action and, therefore, is

14 entitled to an award of his reasonable attorney's fees and costs.

15      106.   Apttus's interference with Marco's contractual relationship with SAP

16 America was reckless, wanton and malicious, entitling Marco to an award of exemplary

17 and punitive damages in a sum in excess of $15,000.00.

18

19 **SEVENTH CLAIM FOR RELIEF**
**Unjust Enrichment/Quasi-Contract**

20      107.   Marco realleges the allegations in paragraphs 1-106 as though fully set

21 forth here.

22      108.   Apttus derived benefits from the valuable services Marco provided to

23 Apttus in recruiting new hires, thereby saving Apttus recruiting fees, for which it

24 previously paid $7 MILLION dollars in the prior year.

25      109.   The services provided by Marco in recruiting new hires were separate and

26 apart from, and totally unrelated to, the duties of Marco under his employment contract

27 with Apttus.

28

110.   The value of these services to Apttus is estimated to be in excess of $100,000 per employee, but will be more closely approximated once Marco conducts a forensic accounting of the financial activities of Apttus during the discovery phase of this case.

111.   To date, Apttus has failed and refused to pay Marco for such services, and instead, has accepted and retained the benefits derived from the services of Marco, and, thereby, has been unjustly enriched by its conduct, all to the business and financial benefit of Apttus and the substantial personal financial detriment of Marco. Under these circumstances, it would be inequitable and offend the fundamental principles of justice, equity and good conscience to allow Apttus to retain the valuable benefits without payment to Marco.

112.   As a direct and proximate result of said conduct, Marco has incurred general damages in a sum in excess of $15,000.

113.   As a further direct and proximate result of said conduct, Marco has incurred special damages in a sum that has not yet been fully determined. Marco will seek leave to amend this Complaint to conform to proof at the time of trial.

114.   The above-described conduct by Apttus was reckless, wanton and malicious, and Marco is, thereby, entitled to an award of exemplary and punitive damages in a sum in excess of $ 15,000 from Apttus.

115.   As a further direct and proximate result of Apttus's conduct, Marco has been required to retain the services of an attorney to pursue his legal remedies in this action and, therefore, is entitled to an award of his reasonable attorney's fees, expenses and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Marco prays for relief as follows:

1.   Judgment in his favor and against Apttus on all claims for relief stated in the Complaint;

2.    An award of general damages in his favor and against Apttus, in an amount in excess of $15,000;

3.    An award of punitive damages against Apttus, in an amount in excess of $15,000;

4.    An award of special damages according to proof at the time of trial;

5.    An award of interests, costs and attorney's fees to him and against Apttus;

6.    For such other and further relief as this Court deems just and proper.

## AFFIRMATION PURSUANT TO NRS 239B.030

I hereby affirm that this document does not contain the social security number of any person.

DATED this 27th day of July, 2017

/s/ Michael J. Morrison

Michael J. Morrison, Esq.
Nevada State Bar No. 1665
1495 Ridgeview Drive, Suite 220
Reno, NV 89519
Tel. 775-827-6300
venturelawusa@gmail.com

*Attorney for Plaintiff*

# EXHIBIT B

# EXHIBIT B

CODE 4085

COPY

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
IN AND FOR THE COUNTY OF WASHOE

MARCO DE LA CUESTA, an individual

        Plaintiff,

    vs.

APTTUS CORPORATION

        Defendant.

Case No.  CV17-01433

Dept. No.  1

_____/

**SUMMONS**

**TO THE DEFENDANT:   YOU HAVE BEEN SUED.  THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU <u>RESPOND IN WRITING</u> WITHIN 20 DAYS. READ THE INFORMATION BELOW VERY CAREFULLY.**

A civil complaint or petition has been filed by the plaintiff(s) against you for the relief as set forth in that document (see complaint or petition).  When service is by publication, add a brief statement of the object of the action.  See Nevada Rules of Civil Procedure, Rule 4(b).
The object of this action is: COLLECT MONEY DAMAGES

1.  If you intend to defend this lawsuit, you must do the following within 20 days after service of this summons, exclusive of the day of service:

    a.  File with the Clerk of the Court, whose address is shown below, **a formal written answer** to the complaint or petition, along with the appropriate filing fees, in accordance with the rules of the Court, and;

    b.  Serve a copy of your answer upon the attorney or plaintiff(s) whose name and address is shown below.

2.  Unless you respond, a default will be entered upon application of the plaintiff(s) and this Court may enter a judgment against you for the relief demanded in the complaint or petition.

Dated this _28_ day of _July_ , 20_17_.

Issued on behalf of Plaintiff :

Name:  Michael J. Morrison, Esq. NSB #1665

Address:  1495 Ridgeview Drive, Ste. 220, Reno, NV 89519

Phone Number : 775-827-6300

JACQUELINE BRYANT
CLERK OF THE COURT

By: _____  K. Hudson
Deputy Clerk  Second Judicial
District Court 75 Court Street
   Reno, Nevada 89501

## DECLARATION OF PERSONAL SERVICE

(To be filled out and signed by the person who served the Defendant or Respondent)

STATE OF_____)
                                )
COUNTY OF_____)

I,_____, declare:
    (Name of person who completed service)

1.  That I am not a party to this action and I am over 18 years of age.

2.  That I personally served a copy of the Summons and the following documents:

    _____

    _____

    _____

upon_____, at the following
       (Name of Respondent/Defendant who was served)

address: _____

    _____

on the_____day    of_____, 20_____.
                         (Month)           (Year)

This document does not contain the Social Security Number of any Person.

I declare, under penalty of perjury under the law of then State of Nevada, that the foregoing is true
and correct.

                         _____
                         (Signature of person who completed service)

Revised 07/19/2012                    2                    SUMMONS

# EXHIBIT C

# EXHIBIT C

1

### DECLARATION OF MARGO M. SMITH IN
### SUPPORT OF NOTICE OF REMOVAL

2

I, Margo M. Smith, declare and state as follows:

3

1.    I am over the age of 18 and competent to testify.  The following facts are based on

4

my personal knowledge or based on my personal review of records kept in the course of regularly

5

conducted business activities by Apttus Corporation (the "Company").  If called as a witness, I

6

am competent to testify as to these facts.  I submit this declaration in support of Defendant's

7

Notice of Removal.

8

2.    I am the Company's Executive Vice President, Chief Legal Officer & General

9

Counsel.  I am familiar with the Company's basic corporate structure, operations, and officers.

10

The Company is a corporation incorporated under the laws of Delaware with its principal place of

11

business in San Mateo, California.  The Company's corporate headquarters is located at 1400

12

Fashion Island Boulevard, San Mateo, California 94404, where the Company conducts a

13

predominance of its corporate and business activities, including all of the Company's primary

14

executive, administrative, financial and management functions, and where the high level officers

15

direct, control, and coordinate the Company's activities.

16

3.    I declare under penalty of perjury that the foregoing is true and correct.

17

EXECUTED this 29th day of August, 2017.

18

19

_____
Margo M. Smith

20

4831-1615-4182, v. 3

21

22

23

24

25

26

27

28

JACKSON LEWIS LLP
LAS VEGAS